**OHIO STATE PHARMACEUTICAL ASSOCIATION, et al., Plaintiffs,**

v.

**Kenneth B. CREASY, et al., Defendants.**

**No. C–2–81–1055.**

United States District Court, S.D. Ohio, E.D.

April 20, 1984.

C. William O'Neill, James H. Hedden, Columbus, Ohio, for plaintiffs.

Jeffrey J. Jurca, Kathleen McManus, Asst. Attys. Gen., Columbus, Ohio, for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

This matter is before the Court on cross-motions for summary judgment. It is an action commenced by plaintiffs, Ohio State Pharmaceutical Association, Kuntz Drug Stores, Inc. and Toledo Nursing Home Services, Inc., for declaratory and injunctive relief from an alleged failure by the defendants to fully and to promptly pay pharmaceutical provider claims incurred as a result of the providers' participation in the State's Medicaid program. Kenneth B. Creasy, acting director of the Ohio Department of Public Welfare (ODPW) and William D. Keip, acting director of the Office of Budget and Management (OBM) were named as defendants. Mr. Keip left his position on January 1, 1982, and was replaced by Howard L. Collier.

Plaintiffs' class action complaint alleges, in substance, that the defendants' pattern of handling the State's financial obligations in times of cash flow crises, the classification of these obligations as priority and non-priority, the inclusion of Medicaid pharmaceutical provider claims in the non-priority category, and the resultant delay in reimbursement payments to providers of pharmaceutical care amounts to a continuing policy of delayed payments of Medicaid claims in a manner which violates the timely payment provisions of 42 U.S.C. § 1396a(a)(37) and 42 C.F.R. § 447.45 of Title XIX of the Social Security Act. Plaintiffs further allege that the current dispensing fee of $2.60 is arbitrary, unreasonable, invalid and void because the survey conducted by ODPW does not accurately reflect current pharmacy operational costs.

Plaintiffs request that the Court grant declaratory relief by holding that the provisions of 42 U.S.C. § 1396a(a)(37) and 42 C.F.R. § 447.45 are applicable to and binding upon defendants in their administration of the state Medicaid program; that the Court grant preliminary and permanent injunctive relief requiring defendants to comply with the provisions of 42 U.S.C. § 1396a(a)(37) and 42 U.S.C. § 447.45 and to approve for payment all clean claims within the statutory time limit; that the Court restrain defendants from enforcing the current limitation upon the dispensing fee paid to pharmaceutical Medicaid providers; and, finally, that the Court direct defendants to conduct a fair and accurate survey of pharmaceutical provider operational costs in order to establish a proper dispensing fee. The plaintiffs request reimbursement for any deficiencies in payment resulting from the use of the current dispensing fee limitations and the award of reasonable attorney's fees.

On March 25, 1981, the Court denied defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). On May 12, 1982, the Court ruled that the matter was properly certifiable as a class action pursuant to Fed.R.Civ.P. 23(b)(1)(B). The class was certified on behalf of all provid-

ers of pharmaceutical services and supplies who are participating in the Medicaid program administered by the ODPW pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*

Cross-motions for summary judgment and a stipulation of facts were submitted to the Court for its consideration. The Court directed the parties to file additional memoranda addressing the question of this Court's jurisdiction over federal statutory and regulatory challenges to state welfare programs. The parties' attention was directed to the plaintiffs' failure to allege any constitutional violations; to their failure to allege a violation of 42 U.S.C. § 1983 which encompasses claims based upon purely statutory violations; and to their failure to allege whether a private right of action may be implied under the Social Security Act.

For the reasons set forth below, this Court finds that the practice of delaying payments to pharmacy Medicaid providers during periods of cash flow crises violates the statutory requirements of the Medicaid program, Title XIX of the Social Security Act. However, the Court finds that the current dispensing fee is reasonable within the meaning of 42 C.F.R. § 447.45.

## I.

From 1980 through October 1982, the State of Ohio experienced an ongoing fiscal crisis. During this crisis, the State's treasury periodically developed cash flow problems; then due and owing payment obligations exceeded available receipts and cash balances. The OBM was unable, on a daily basis, to certify for payment vouchers that had been submitted by various government offices, including ODPW.

Defendant Keip, then director of OBM, addressed the cash flow deficiency problem by separating payment obligations into two categories, priority and non-priority. Priority payments were made first and included: payments to holders of Ohio's bonded indebtedness, state payroll obligations, Aid to Dependent Children (A.D.C.) payments made pursuant to Ohio Revised Code Chapter 5107, Medicaid nursing home payments, other welfare payments, and Public School Foundation Program payments. Non-priority category payments included payments to providers of office supplies and equipment, subsidies to state institutions of higher education, payments to providers of miscellaneous goods and services to state institutions, and Medicaid payments to all other providers except nursing homes. This last group includes payments to pharmacy Medicaid providers.

All vouchers for priority category obligations were promptly approved for payment during periods in which the state treasury experienced cash flow problems. Non-priority obligations were paid only after it was determined that available cash was not needed for priority obligations. Non-priority obligations, then, were paid in the chronological order in which they were received by OBM.

The parties have stipulated that during the period in which the priority/non-priority payment system was in effect less than 90% of pharmacy Medicaid provider "clean claims" [1] were paid within 30 days of receipt by ODPW. Keip's use of non-priority certification of provider claims resulted in a delay in payments of between 45 and 65 days; in some cases payment was delayed for more than 65 days. When cash flow problems subsided, OBM began immediately certifying that adequate cash was available for payment of all state obligations. Since January of 1982, payments have been made to pharmacy Medicaid providers in accord with the approved plan. However, it is stipulated that in the event of a future cash flow problem, the State will adopt the

---

1. 42 C.F.R. § 447.45(B) provides:
 "Claim" means (1) a bill for services, (2) a line item of service, or (3) all services for one recipient within a bill.
 "Clean claim" means one that can be processed without obtaining additional information from the provider of a service or from a third party. It includes a claim with errors originating in a state's claim service. It does not include a claim from a provider who is under investigation for fraud or abuse, or a claim under review for medical necessity.

same practice with respect to priority/non-priority classification of its obligations.[2]

## A. *Subject Matter Jurisdiction*

In response to the Court's inquiry as to the basis of subject matter jurisdiction, plaintiffs argue that jurisdiction is conferred by 28 U.S.C. § 1331. They state that "when a party challenges the action of state officials because their action violates obligations imposed by the Social Security Act jurisdiction exists pursuant to 28 U.S.C. § 1331 to hear such claims." Supplemental Brief of Plaintiffs Concerning Jurisdictional Matters, p. 6. Apparently, defendants do not challenge jurisdiction but urge that plaintiffs fail to state a federal cause of action upon which this Court may grant relief.

Title 42 U.S.C. § 1396a(a)(37) (1983) sets forth a state's timely payment obligation and provides that:

[A] state plan for medical assistance *must* ... provide for claims payment procedures which (A) ensure that 90 per centum of claims for payment ... made for services covered under the plan and furnished by health care practitioners through individual or group practices ... are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within ninety days of receipt of such claims, ... (Emphasis added.)

The plaintiffs claim that the OBM Director's prioritization policy results in significant delays in reimbursement to pharmacy Medicaid providers thereby violating the obligations imposed by 42 U.S.C. § 1396a(a)(37). Plaintiffs claim that in the absence of timely reimbursements it is im-

possible for individual pharmacists to stock or replenish their supply of medications. This inability to replenish inventory may be particularly problematic for those pharmacists who do a large volume of Medicaid business.

■ The Court agrees that plaintiffs state a claim "arising under the ... laws ... of the United States." 28 U.S.C. § 1331. In *Lindy v. Lynn*, 501 F.2d 1367, 1369 (3d Cir.1974) the scope of § 1331 federal question jurisdiction was described as follows:

An action arises under the laws of the United States if and only if the complaint seeks a remedy expressly granted by a federal law or if it requires the construction of a federal statute or a distinctive policy of a federal statute requires the application of federal legal principles for its disposition.

The three analytical categories set forth in *Lindy* were utilized by Judge Rice in *Jemo Associates v. Greene Metro Housing Authority*, 523 F.Supp. 186 (S.D.Ohio 1981) (court found no § 1331 jurisdiction because allegations of non-performance of a contract do not become questions of federal law merely because a federal agency was party to the contract). This Court also believes that the inquiries set forth in *Lindy* are helpful in determining the existence of a federal question.

Defendants argue that the State's significant interest in the management of its fiscal crises temporarily excuses defendants from timely payment obligations imposed by the Social Security Act. Whether the director of OBM has this discretion in the context of this cooperative welfare program is a question of federal, not state,

---

**2.** While it is true that payments are currently being made in a timely manner, the State's current compliance with the federal regulations does not render this issue moot. The defendants have stipulated that in the event of another cash flow problem the challenged priority/non-priority system will again be put into effect. Cases or controversies will not be considered moot if the issue is such that it is capable of reoccurring but evading review. *So. Pac. Terminal Co. v. Interstate Commerce Commis-*

*sion,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Super Tire Engineering v. McCorkle*, 416 U.S. 115, 125, 94 S.Ct. 1694, 1699, 40 L.Ed.2d 1 (1974) (Suit for declaratory and injunctive relief was brought which challenged the validity of a state welfare program regulation. The parties to the suit reached a settlement agreement. However, in that the plaintiff had sought declaratory relief, and since the issue was capable of repetition, the Court held that the case was not moot.)

law. The federal government's extensive regulation of the Social Security field, and its control over the monies allotted thereunder, is persuasive evidence of a distinctive federal policy requiring the application of federal legal principles.

Plaintiffs' second claim is that the dispensing fee established by the State of Ohio is arbitrary and unreasonable and has not been established on a cost related basis, and further that the ODPW's director has failed to conduct a survey which adequately reflects the pharmacies' actual costs of participating in the program. Plaintiffs argue that the language of 42 C.F.R. §§ 447.331 and 447.333 should be interpreted as requiring a certain minimum dispensing fee. Resolution of this aspect of the controversy requires construction of federal regulations, 42 C.F.R. §§ 447.331–.333, which involves a federal question as discussed in *Lindy, supra.* Accordingly, the Court finds that it has jurisdiction to hear the matters involved in this dispute.

## B. *Cause of Action*

The complaint in this case does not specifically allege a constitutional violation, a statutory violation cognizable pursuant to 42 U.S.C. § 1983 or the existence of a private cause of action under the Social Security Act. Although the complaint should state with specificity the basis for a cause of action, the Court finds that in this case the complaint fully informs the defendants of the allegations against them. Under modern concepts of notice pleading, a cause of action sufficient to withstand a Rule 12(b)(6) motion has been stated.

In response to the Court's request, both parties have addressed the issue of whether an allegation that the defendants violated a provision of the Social Security Act states a claim under § 1983. Plaintiffs argue that the Supreme Court has specifically recognized in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1979) the existence of a cause of action under § 1983 when state action is alleged to violate the Social Security Act.

Even were the language [in § 1983] ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law.

... [O]ur analysis in several § 1983 cases involving Social Security Act (SSA) claims has relied on the availability of a § 1983 cause of action for statutory claims. Constitutional claims were also raised in these cases, providing a jurisdictional base, but the statutory claims were allowed to go forward, and were decided on the merits, under the court's pendent jurisdiction.

*Maine v. Thiboutot*, 448 U.S. 1, 4–6, 100 S.Ct. 2502, 2504–05, 65 L.Ed.2d 555 (1979) (see cases cited therein). Plaintiffs' allegation that the State's budget management policies violate certain provisions of the Social Security Act states a cognizable claim under 42 U.S.C. § 1983.

## C. *Deference*

Defendants claim that the "real issue presented is whether state officials exercised proper discretion in making accommodations to deal with the State's temporary fiscal emergency of insufficient cash." Defendants' Memorandum in Support of Motion for Summary Judgment, p. 4. They argue that plaintiffs do not desire to compel defendants to act on the federal timely payment requirement but rather that the Court "set aside the determination of the Director of OBM on how best to deal with the problem of temporary insufficient state funds." *Id.* The defendants then cite United States Supreme Court decisions which state that the district court must grant decisions or judgments of agency officials "great deference" in its review of their actions. This argument is not relevant to the issue before the Court.

Generally, federal agencies and their officials acting pursuant to a grant or delegation of authority from Congress have reasonable latitude in making decisions and promulgating regulations with respect to subject matter within their purview. Like-

wise, state agencies or their directors acting pursuant to a grant or delegation of authority from a state legislature have reasonable latitude with respect to decisions made within their administrative domain. In this case, the Court should afford reasonable deference to certain administrative decisions made by the Secretary of Health and Human Services with regard to the Social Security Program. Similarly, this Court should afford reasonable deference to decisions of the Director of OPDW with respect to his implementation of those portions of the Medicaid program which by statute or regulation have been left to his discretion.

■ However, § 1396a(a)(37) does not provide the state agency discretion to deviate from the timely payment requirements of that provision. If such discretion had been given to the ODPW as the state agency responsible for the Medicaid program, it would be the only state agency entitled to exercise that discretion. Neither HHS nor the state legislature delegated to the OBM's director any authority with respect to the state Medicaid program. Therefore, the Court is not obligated to defer to his decisions in this matter.

### D. Res Judicata

■ Defendants also argue that this case is barred by the doctrine of res judicata. The parties to this action are substantially identical to the parties in State, ex rel. Home Care Pharmacy, Inc. v. Creasy, 67 Ohio St.2d 342, 21 O.O.3d 215, 423 N.E.2d 482 (1981). The issues raised at that time were also substantially identical. Defendants argue that the Supreme Court of Ohio has reviewed the State's policy of prioritization and found it to be appropriate. However, the Supreme Court of Ohio has not decided the merits of this case. Home Care Pharmacy dealt only with the issue of whether a writ of mandamus could issue to grant prospective relief in the form of ordering the State to comply with federal law. The Court held that a writ of mandamus would not issue for that purpose. This Court is, therefore, not obligated to grant res judicata or collateral estoppel effect to that State court judgment.

### E. Abstention

The doctrine of abstention is the third basis upon which defendants would have the Court stay its action. Defendants argue that "abstention is a doctrine of federal jurisprudence infused with principles of comity and federalism, designed to prevent federal confrontation with the state court's handling of state questions that may also involve a federal issue." Defendants' Brief on Motion to Dismiss, p. 9. They urge that this Court should not interfere in the State's handling of its budgetary problems.

The Social Security Act establishes a number of cooperative funding programs wherein federal and state funds are used to provide needed health related services to persons who cannot provide for themselves. As a part of these programs various health care providers are reimbursed by a participating state for services rendered to qualified Medicaid patients. The Medicaid Program, as a part of the Social Security Act, is extensively regulated by the Department of Health and Human Services. State participation is voluntary, but if undertaken must be in compliance with federal regulations. King v. Smith, 392 U.S. 309, 317, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968).

Defendants cite Burford v. Sun Oil, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) as the basis upon which this Court should abstain. In Burford plaintiffs attacked an order of the Texas Railroad Commission. The Commission was granted extensive authority to regulate the drilling of wells in Texas gas and oil fields as well as the rate at which these resources could be extracted. Burford was granted permission to drill wells on a small section of an East Texas oil field. The granting or withholding of permission to drill was of substantial importance to persons involved in the oil and gas industry. Certain geological factors make it likely that the drilling of a well in one portion of an oil or gas field will have an effect on another part of

the field. An extensive system of state regulation had been set up to prevent potential harm resulting from uncontrolled exploitation of an exhaustible natural resource. Texas had a significant interest in a uniform application of these regulations because of the substantial impact of the oil and gas industry on its economy. The Texas legislature vested jurisdiction over direct review of the Commission's orders in the state district courts of Travis County. Centralization of review authority promoted uniformity in the review process; this uniformity was crucial to prevent "untolerable confusion" in the regulatory system. The Supreme Court held that district court abstention was appropriate out of regard for the State's interest in assuring uniform application of its regulations. Review by a federal district court not specially versed in a particularly complex area could very well result in the very inconsistencies the State sought to avoid by establishing the regulatory review system.

■ The priority/non-priority cash allocation system at issue in this case does not present a complex system of state regulation which has been promulgated to deal with primarily state concerns. It is a method established by an agency to cope with certain fiscal emergencies. Even though the State may have a substantial interest in the management of its budget, there is no risk of an inconsistent application of state law or policy presented by the case at bar. The regulations which must be interpreted to resolve this matter are federal; the uniformity of application or interpretation of these regulations is a federal concern.

The Court does not purport to advise the Director of OBM that the agency must totally abandon its priority/non-priority system of budget management. The State or its agencies may develop any number of fiscal management plans so long as the plans do not violate federal law with respect to the State's timely payment obligations in this particular voluntary cooperative funding program. Accordingly, this case is not a proper one for *Burford* abstention.

## II.

### A. *Priority/Non-Priority Reimbursement System*

■ The federal government may impose terms and conditions upon the allotment of money to a state. State laws, regulations or policies which are inconsistent with federal regulations are invalid and may result in termination of funds under the Social Security program. *King v. Smith, supra,* 392 U.S. 317, 88 S.Ct. 2133; *Potter v. James,* 499 F.Supp. 607 (M.D.Ala. 1981); *Alabama Nursing Home Assn. v. Califano,* 433 F.Supp. 1325, 1330 (M.D.Ala. 1977). The Secretary of Health and Human Services may terminate payments to a state if she finds that the state's plan "has been so changed that it no longer complies with the provisions of § 1396a of this title; or that in the administration of the plan there is a failure to comply substantially with any such provision." 42 U.S.C. § 1396c. The defendants acknowledge this obligation and point to the fact that the Ohio Medicaid Management System (MMIS) is in full compliance with the State's obligation under the Social Security Act. The defendants argue that concepts of federalism and the State's overwhelming interest in the management of its budgetary affairs, in certain instances, excuses it from compliance with provisions of the Act. The Court does not accept the suggested distinction between Creasy's statutory duty to develop and adopt a conforming reimbursement plan as a precondition to the allotment of funds and the Director of OBM's obligation to act in accordance with that approved plan regardless of the State's financial situation at any given time.

Other courts have addressed similar issues involving the interaction of state fiscal policy and federal Social Security regulation. In *Massachusetts General Hospital v. Sargent,* 397 F.Supp. 1056 (D.Mass. 1975), the court considered the question whether a state's policy and practice of paying provider hospital claims only out of

funds appropriated for the year in which the claims accrued violated federal law.

Massachusetts passed certain legislation which did not authorize current appropriations to be used for payment of past obligations. This statutory scheme applied to all of the Commonwealth's financial obligations. Past obligations were paid, if at all, as a result of the amendment of special supplemental appropriations bills. Certain hospital services had not been paid for in the year in which they accrued. As a result, large amounts of monies were owed to hospitals for services rendered under the Social Security program. The appropriations policy resulted in delayed payments and necessitated that hospital providers borrow or otherwise advance their own funds in order to purchase replacement goods well before the legislature passed special appropriations bills. This delay placed a significant financial burden upon the health care providers.

The Social Security provision at issue in *Sargent* was 42 U.S.C. § 1396a(a)(13)(D) and its implementing regulations. These regulations contained certain timely payment provisions analogous to those presently before this Court. "Interim payments approximating the actual costs of the provider will be made on the most expeditious basis administratively feasible *but not less often than monthly." Sargent, supra,* p. 1061, citing 20 C.F.R. § 405.454(a).[3]

In reaching its decision with respect to whether Massachusetts' appropriations policy violated the Social Security regulations, the court noted that Title XIX mandated full and prompt payment of Medicaid inpatient provider claims and that "so long as ... Massachusetts chose to participate in the ... Medicaid program, federal law requires" full and prompt payment of the provider claims. *Sargent, supra.* Defendants in this case do not argue that timely payment is not mandated by § 1396a(a)(37)

but that they may, when necessary, opt to delay payments when experiencing cash flow problems. With respect to Massachusetts' appropriations policy the district court noted that

> Any failure to [fully and promptly pay] regardless of the reason, is a violation of the Social Security Act.... the Commonwealth's policy ... has resulted in [its] failure to promptly pay the full reasonable costs of inpatient care rendered by MGH and other providers. This policy and practice violate the Social Security Act.

*Sargent, supra,* p. 1062.

This Court finds the *Sargent* court's reasoning persuasive. Compliance with federal conditions on the allotment of monies is not discretionary in the case at bar. Section 1396a *et seq.* speaks in terms of "a state must" implement a plan in compliance with its regulations. Permissible exceptions are enumerated; provisions for waiver are included. A state's need to accommodate its budgetary fluctuations is not an enumerated exception, nor have the defendants in this case requested a waiver.

The defendants seek to distinguish this case on the basis that arrearages were owed to the hospitals in *Sargent* and that no such amounts are owed to the plaintiffs herein. The fact that the Commonwealth of Massachusetts' policy of underappropriation resulted in arrearages whereas Ohio's policy of prioritizing payments results only in delays, does not make the reasoning of *Sargent* any less persuasive.

Defendants argue that the court in *Sargent* found that the Commonwealth's ongoing pattern and policy was to deliberately underappropriate funds for Medicaid reimbursement. This "deliberate" underappropriation resulted in arrearages. Defendants assert that there is no such "deliberate" failure in this case because OBM is reacting to an emergency, not establishing an ongoing policy of late payment. Both in

---

**3.** In *Sargent,* the court noted that the Secretary had indicated that the standards and principles used regarding payments for Medicare services are generally applicable regarding Medicaid payments for inpatient services. The Medicare standard involved was then designated as 20 C.F.R. § 405.454(d).

*Sargent* and in the case at bar, a state's policy with respect to allocating funds to meet its financial obligations resulted in a failure to comply with federal regulations. It is a distinction without difference to argue that a state legislature caused the ongoing failure to pay in *Sargent* while a state agency caused the occasional failure to timely pay in this case. It would be illogical to allow a state agency to alter a federal reimbursement scheme by the discretionary application of funds under a conforming state plan for the purpose of fiscal management when the state legislature is prohibited from enacting budgetary legislation to attain the same goal.

Other district courts have also found that states may not allow their fiscal management policies to override their obligations under the Social Security Act. In *Alabama Nursing Homes Assn. v. Califano*, 433 F.Supp. 1325 (M.D.Ala.1977), plaintiffs challenged Alabama's plan which set an absolute per patient per day ceiling for payments to skilled nursing home and intermediate care facilities. The federal statute, 42 U.S.C. § 1396a(a)(13)(E), requires that state Medicaid plans provide for reimbursement to skilled nursing homes and intermediate care facilities "on a reasonable cost related basis." It was undisputed that the ceiling established by the legislature was not cost related within the meaning of § 1396a(a)(13)(E). The state agency defended its use of a non-cost related ceiling by asserting that the "Alabama legislature had appropriated insufficient funds to pay for the increase in expenditures which would result from having to set rates on a completely cost related basis." *Alabama Nursing Home, supra*, p. 1330. Alabama essentially argued that budgetary considerations justified non-compliance with the provisions of the Social Security Act. In response to this line of argument the court stated that

> However, inadequate funding does not excuse failure to comply with federal standards. [Citations omitted.] There is no provision, express or implied, in the Social Security Act permitting a state to alter federal standards to suit its budget-

ary needs. State participation in the Social Security Act programs is voluntary, and the state may withdraw if it wishes.... If a state could evade the requirements of the Act simply by failing to meet them, it could rewrite the Congressionally imposed standards at will.... Alabama must meet the statutory requirements so long as it remains in the Medicaid program, regardless of budgetary considerations.

*Alabama Nursing Home Assn. supra*, p. 1330. *See, Potter v. James*, 499 F.Supp. 607, 610 (M.D.Ala.1980).

In the case at bar the defendants' priority/non-priority payment system was implemented to address budget problems which resulted from inadequate resources to meet the State's financial obligations. The fact that Alabama's system of underappropriation was pursuant to a non-complying plan does not, as defendants argue, make it significantly different from this case. The adoption of a conforming state plan will only satisfy HHS regulations if that plan is adhered to. The mere fact that a conforming plan is in existence does not satisfy federal law if it can be abandoned at the will of the defendants.

█ This Court finds that the OBM Director's policy and practice of relegating to non-priority status reimbursement payments to Medicaid providers of pharmaceutical care violates federal law. As a state agency OBM has not been delegated any general authority with respect to the Medicaid program and no specific authority to delay payments of reimbursements to Medicaid providers. While the Court understands and is sympathetic to the OBM Director's difficulty in meeting the State's financial obligations when it is experiencing cash flow problems, this Court can find no theory of law which permits OBM or ODPW to alter the State's obligations under the Social Security Act in order to accommodate its budgetary considerations.

**B. *Dispensing Fee***

We turn next to a consideration of whether the current dispensing fee of $2.60

is so low as to be unreasonable, arbitrary and inconsistent with the requirements of 42 C.F.R. §§ 447.331–.333, *infra*. Plaintiffs argue that the

> regulations on their face set a *minimum fee* to which providers rendering services and supplies under the Act are entitled in that a "reasonable dispensing fee must be paid by the State when it chooses not to pay the provider's customary charge to the general public" .... Implicit in these regulations is the requirement that the dispensing fee be reasonably related to the cost of doing business. (Emphasis added.)

Plaintiffs' Memorandum in Support of Summary Judgment, p. 10. They state that the data utilized by ODPW in its survey does not reveal the true cost of doing business and the dispensing fee based thereon is unreasonable and arbitrary.

Defendants argue that § 447.331 sets an upper limit on what payments may be made, not a minimum which must be met. They further argue that the ODPW has conducted periodic surveys in accordance with § 447.333 and that, even if a minimum fee is required, the current dispensing fee of $2.60 is "reasonable" within the meaning of those sections. Whether a "minimum fee" has been established begs the question. Certainly, if a rate is so low as to be unreasonable, it is below an acceptable minimum. The real questions are whose survey and what factors should determine the reasonableness of the fee.

Part 447, Subpart D, § 447.331 is entitled *Drugs: Upper limits of payment* and provides that, "(a) The agency may not pay more for prescribed drugs than the lower of ingredient cost plus a reasonable dispensing fee or the provider's usual charge to the general public .... (c) The dispensing fee must be set by the agency under § 447.333."

Section 447.333 provides that "(a) The agency may set the dispensing fee by taking into account the results of surveys of the costs of pharmacy operation. The agency must periodically survey pharmacy operations including (1) operational data; (2) professional services data; (3) overhead data; and (4) profit data."

In addition to the language of the statute itself, the Court has before it an affidavit from Vytas Zalatorius, Medicaid representative to the State of Ohio. He is employed by the Health Care Financing Administration, HHS. He is responsible for evaluating the conformity of Ohio's plan with the pertinent federal statutes and regulations. He states in his affidavit that

> It is the position of the Regional and Central Offices of the Health Care Financing Administration, [HHS] that 42 C.F.R. 447.331 deals only with upper limits for payments of services which a State may not exceed and that 42 C.F.R. 447.331 and 447.333 do not impose upon a participating state a duty to pay a minimum drug reimbursement cost.

*Zalatorius* affidavit, ¶ 7.

Plaintiffs argue that the predecessor to 42 C.F.R. § 447.331 (45 C.F.R. § 250.30(b)(2)(i)(g)) contained language substantially different from the language of the present regulation. They state that the fact that the "reasonable dispensing fee" language was added requires that a cost related dispensing fee be paid. Plaintiffs further argue that the addition of this language implicitly requires that the "dispensing fee be reasonably related to the cost of doing business since its purpose is to allow participating providers a modest profit." *Id.* While the Court may agree that the dispensing fee must be reasonable under the statute, and that § 447.333 provides that profit data must be taken into account when determining a reasonable dispensing fee,[4] the statute does not explicitly or im-

---

4. Section 447.333 provides that:
 (a) The agency may set the dispensing fee by taking into account the results of surveys of the costs of pharmacy operations. The agency must periodically survey pharmacy operations including:

 (1) operational data;
 (2) professional services data;
 (3) overhead data; and
 (4) profit data.
 (b) The dispensing fee *may* also vary according to:

plicitly call for the setting of a minimum fee rate nor require that pharmaceutical providers be reimbursed for all costs incurred.

 Although in establishing a reasonable fee the state agency must survey and consider pharmaceutical providers' costs, this does not mean that all providers must be reimbursed according to their individual expenditures. "The agency may not pay more for prescribed drugs than the lower of ingredient cost plus a reasonable dispensing fee or the provider's usual and customary charge to the general public." 42 C.F.R. 447.33(a). In that the former amount may be less than what an individual provider would normally charge the public, and that if it is in fact lower, the provider must be reimbursed this lesser amount, it follows that the statute does not intend to reimburse all pharmaceutical providers for actual costs incurred.

Under the regulatory scheme, the state agency must conduct a survey to establish a reasonable dispensing fee. The frequency with which the survey must be conducted is not specified. In 1977, ODPW conducted a survey of pharmacy operators and determined, after settlement negotiations with the Ohio State Pharmaceutical Association (OSPA), that the then existing dispensing fee of $2.00 would be raised to $2.60. In 1979, ODPW conducted another survey and determined that an increase at that time in the pharmacy dispensing fee was unwarranted. This same procedure was followed in 1980. "ODPW determined that on the basis of the pharmacy profit and cost figures provided as well as certain operating factors associated with the pharmacy business in Ohio, that dispensing fee should not be increased." (Stipulations of Fact, p. 10, latest survey as of October 1982).

At the request of OSPA, The Ohio State University Division of Pharmacy Administration (Pharmacy Administration) conducted a survey in 1980 of independent pharma-

cies in the Central Ohio area. Plaintiffs argue that this survey led Pharmacy Administration to conclude that average dispensing costs were substantially higher than indicated in the ODPW survey and that pharmacists were incurring significant losses which they had to absorb or pass on to non-Medicaid customers. Apparently plaintiffs argue that the fact that this survey came up with different figures than the ODPW survey and that it shows certain pharmacies are losing money is sufficient evidence to cause this Court to direct the agency to conduct another survey or to change its dispensing fee.

The final data analysis in the survey conducted by Pharmacy Administration used 39 responses from providers. This number reflects 28.8% of the initial survey pool. The ODPW analysis used 316 survey responses, 14.7% of the initial survey pool. Although the rate of response of the total pool used by the ODPW was arguably one-half that of the rate of participation in the Pharmacy Administration survey, the number of actual responses was almost nine times as great. Moreover, the pool used by the Pharmacy Administration was drawn only from independent pharmacists in the Central Ohio area. Facts set forth in Exhibit D indicate that the gross profit (dispensing fee) for independent pharmacies is greater than for chains, $2.95 and $2.52, respectively. The fact that plaintiffs' survey pool has significantly fewer data sources and does not include chain pharmacies does not aid in persuading the Court that the ODPW survey was unreliable or unreasonable.

 The ODPW survey appears to take into account the factors set forth in § 447.333. This Court's review function is limited. Although the current dispensing fee may not fully reimburse *all* pharmacy Medicaid providers for all costs of dispensing drugs under the program, it is not so arbitrary or unreasonable so as to be unlawful under the Medicaid regulations. Accordingly, this Court concludes that the dis-

(1) size and location of pharmacy;
(2) whether the drug is a legend item (for which Federal law requires a prescription) or

nonlegend item; ...

**710**

pensing fee set by the ODPW meets the requirements of 42 U.S.C. § 1396a as implemented in 42 C.F.R. § 447.331–.333.

III.

 Plaintiffs request declaratory relief and injunctive relief. The Court finds it unnecessary to enjoin the Director of OBM from further use of the priority/non-priority payment system insofar as he classifies reimbursement payments to pharmacy Medicaid providers as non-priority; the declaratory relief provided by this order is sufficient. Other federal courts have declined to enter injunctions against state officials on the assumption that the officials would in good faith honor the declaratory judgment of the courts. *Roe v. Wade*, 410 U.S. 113, 166, 93 S.Ct. 705, 733, 35 L.Ed.2d 147 (1973); *Sargent, supra*, 1063. It is this Court's judgment that the OBM Director's practice and policy of delaying reimbursement payments to pharmacy Medicaid providers under the OBM's prioritization scheme as it applies to those providers is in violation of federal law. It is the further judgment of the Court that the dispensing fee set by ODPW was arrived at in accord with the method set forth in the regulations; it has not been shown to be arbitrary or capricious.